IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **MICHELLE JAUQUET**, individually and as legal guardian of I. R., her minor child.<br>Plaintiff,<br><br>vs.<br><br>**GREEN BAY AREA CATHOLIC EDUCATION, Inc.,** a Wisconsin nonprofit corporation.<br>Defendant. | Case No. **20-cv-647**<br><br>Jury Trial Demanded |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## AND AWARD OF DAMAGES

### INTRODUCTION

1. This Complaint arises from Defendant's failure to maintain a safe and appropriate educational environment for Plaintiff I.R. and other female students, by knowingly acquiescing to sex-specific harassment "so severe, pervasive, and objectively offensive" that it deprives her of equal access to the educational opportunities provided by her school and thus violates Title IX of the Education Amendments of 1972. *Davis v. Monroe City Bd. Of Education*, 526 U.S. 629 (1999).

### PARTIES

2. Plaintiff I.R. is a natural person and minor child residing in Brown County, Wisconsin.

3. Plaintiff Michelle Jauquet is a natural person residing in Brown County, Wisconsin. Jauquet is the mother and a legal guardian of I.R..

4. Defendant Green Bay Area Catholic Education, Inc. (GRACE) is a Wisconsin nonprofit corporation headquartered in Brown County, Wisconsin.

5. GRACE operates a Catholic school system consisting of nine primary and secondary schools with eleven campuses, all in the Green Bay metropolitan area.

6. GRACE receives Federal financial assistance including, but not necessarily limited to, funding through the National School Lunch Program.

7. This Court retains jurisdiction over the case and controversy as all parties reside or operate within Brown County, Wisconsin, within the bounds of the Eastern District of Wisconsin, and are subject to service therein.

8. Subject matter jurisdiction is proper under two authorities:

    a. The Court retains jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction), as this case arises under Title IX of the Education Amendments of 1972 (20 U.S.C. §1681-1688).

    b. The Court also retains supplemental jurisdiction under 28 U.S.C. §1367 of Wisconsin state law claims included herein, as all such claims detailed

below arise from the same actions and omissions by the same parties, effectively part of the same case and controversy.

7. Venue is proper in the Eastern District of Wisconsin as all parties reside and operate therein, and the factual allegations necessitating the filing of this Complaint occurred entirely, or nearly entirely, within the bounds of Brown County, Wisconsin, within the boundaries of the Eastern District of Wisconsin.

FACTUAL ALLEGATIONS

8. I.R. has been a student in GRACE's school system since moving to the Green Bay area in 4th Grade.

9. During the 2019-2020 academic year, I.R. has remained an 8th grade student in good standing at Notre Dame of De Pere Catholic Middle School, where she has been an Honor Roll student throughout Middle School.

10. Located in De Pere, Wisconsin, Notre Dame of De Pere (hereinafter "Notre Dame") is a Pre-Kindergarten through 8th Grade elementary and middle school operated by GRACE.

11. I.R. has regularly attended 8th Grade classes at Notre Dame during the entire 2019-2020 academic year up until the government ordered closure of in-person classes due to the COVID-19 pandemic.

12. I.R.'s 8th Grade class consists of forty-two students, a slim majority of which are female.

*The Sexual Bullying Begins*

13. During the fall of 2019, I.R. began to experience severe bullying from a group of male students led by B.K., an 8th grade male classmate at Notre Dame of De Pere.

14. In September 2019, I.R. attended a two-night school-sponsored field trip to Camp U-Nah-Li-Ya, near Brussels, Wisconsin.

15. During this September field trip, B.K. and other male students supporting him repeatedly began calling I.R. a "slut" and a "skinny bitch."

16. Jauquet did not involve the Notre Dame of De Pere administration concerning the direct bullying at this point because I.R. feared retaliation if she came forward.

17. By December 2019, B.K. was spreading sexually suggestive and vulgar posts on his Instagram social media page. These were not specifically targeted just to I.R. but the graphic sexual content compelled Plaintiff Michelle Jauquet to report them to the Principal of Notre Dame, Molly Mares.

18. When taking and discussing this report with Jauquet on December 11, 2019, Principal Mares indicated that she was already familiar with the contents (presumably through other complaints or concerns brought to her attention beforehand), agreed that it was unacceptable, thanked Jauquet, and promised to reach out to B.K.'s parents.

19. Jauquet also found out, and disclosed to Principal Mares on December 11th, that as part of a solicitation to engage in sexual acts, B.K. had texted a picture of his own

4

naked penis to a female student at a different school, which was subsequently widely shared with, and seen by, students in I.R.'s class.

20. Due to B.K.'s age, the creation and sharing of this sexually explicit photograph violates Wisconsin's prohibitions on exposure and possession and distribution of child pornography. *See* Wis. Stat. §948.10 and §948.12.

21. Despite her promise to Jauquet, Principal Mares did not contact B.K.'s parents or take any other responsive or protective actions at the time.

22. On December 14, 2019, B.K. initiated an online "Snapchat" conversation under the title "squeeze my wang," in which he and other participants shared multiple sexual body-shaming statements bullying I.R., including for example "if you weren't 50 pounds you would be hot."

23. The pattern of sexual harassment and body-shaming from B.K. and other male classmates became deeply hurtful to I.R., compelling Plaintiff Jauquet to seek a meeting with Principal Mares.

24. On the evening of December 14, Jauquet authored a Facebook social media post about the frustration of parenting a bullying victim. No names were mentioned in the post.

25. During her December 15, 2019, meeting with Principal Mares, Jauquet brought to her attention an additional inappropriate sexual and derogatory video posted by B.K. the previous evening.

26. Due to the pattern of inappropriate and hurtful conduct, Jauquet requested that the school impose discipline on the male students involved by suspending them. Principal Mares responded that she would look into the matter and get back to Jauquet shortly.

*Seeking I.R.'s Death*

27. On December 16, 2020, before any response from the school was received, B.K. verbally proposed to I.R.'s male classmates, "Let's buy [I.R.] a rope and teach her to use it," referring to the use of a noose to hang oneself.

28. Male classmates then passed on this threat or solicitation to I.R., who immediately experienced serious emotional distress.

29. I.R. then emailed her mother to inform her about it and seek help.

30. In response, Jauquet immediately called Notre Dame and attempted to speak with Principal Mares. Despite the seriousness of what was occurring, Jauquet was told Mares was unavailable and was not allowed to speak with Mares.

31. Due to the obvious danger and distress experienced by her daughter, Jauquet drove to Notre Dame and pulled I.R. out of class. At this point, it was revealed that Principal Mares was merely in a Christmas party in the same building.

*The Initial School Response*

32. After Jauquet arrived, Mares was pulled out of the Christmas party and met briefly with Jauquet, who requested law enforcement be called.

33. On information and belief, Mares did not make any report or request to law enforcement or other outside authority in response.

34. Instead, Mares arranged a meeting for 4:30pm the same day, which included I.R., B.K., and both children's parents.

35. Upon arriving at the meeting, Plaintiff Jauquet and I.R. heard Mares coaching B.K. on how to apologize to them and what to say.

36. At the meeting, B.K. issued a rote apology, while B.K.'s parents loudly and aggressively confronted I.R.'s parents for complaining about bullying and sexual harassment, including specifically the Facebook post made about bullying.

37. During the meeting, Mares and B.K.'s parents received or acknowledged actual notice of all B.K.'s sexual bullying behaviors detailed above.

38. The bullying detailed above was also admitted by B.K. in a note sent to I.R. and her family two days later. In the same note, B.K. acknowledged that his previous apology had been insincere.

39. In addition, Principal Mares had actual knowledge of at least the following:

    a. Two years earlier B.K. had also practiced pervasive sexual bullying against a boy using anti-LGBT slurs. The harassment had been severe enough that a written safety plan had to be put in place to help protect the male victim from assault.

b. B.K. was now calling multiple other female students at Notre Dame "sluts." The exact number is unknown to Plaintiff.

c. B.K.'s recent bullying also extended to belittling an adopted classmate and shaming a student suffering from cancer by referring to her as "The Hunchback of Notre Dame."

d. B.K. was continuing to share social media with other Notre Dame students that included vulgar sexual material, as well as numerous racial slurs and obscenity.

e. B.K. was failing academically.

40. No resolution or meaningful understanding was reached at the meeting, nor were Jauquet's requests for the school to remove B.K. successful.

41. Instead, B.K. was given a three-day suspension immediately before Notre Dame's Christmas Break, allowing him an early start to his vacation and ensuring that he would be done with suspension in time to continue playing on Notre Dame's basketball team immediately following Christmas Break.

42. At no time during the proceeding process were any protective or restorative measures or other victim services for I.R. offered or discussed by Mares or any other GRACE employee.

*The Deliberate Indifference Escalates*

43. This indifference led Jauquet to seek a meeting with both Kim Desotell, President of GRACE, and the schools police liaison officer, which was held on December 17, 2019.

44. At the December 17, 2019, meeting, the school liaison De Pere police officer was briefly present, but Desotell informed Jauquet that the officer could not be of help because the Jauquet family lived in nearby Ledgeview, outside her jurisdiction.

45. While Plaintiff notes for the Court the obvious falsehood of the jurisdiction statement as a matter of law since the conduct complained of occurred substantially in De Pere, it is unknown to Plaintiff whether this incorrect statement about jurisdiction was a lie or a gross error.

46. Following the departure of the police officer, President Desotell explicitly supported and defended the decisions made by Mares and indicated they would not be changed.

47. During this discussion, Plaintiff Jauquet communicated substantially the following:

    a. "I am paying for a catholic education. The expectation is that values and kindness are being taught. That aligns with your mission statement and bullying policy. I'm very concerned about the impact on my daughter's mental health and long-term affects given the number of kids involved and the severity of his words and reality of teen suicide."

    b. "Your policy states it covers social media, and to quote your policy: 'We are obliged to follow the Lord's commands and teach our students that 'What you do to the least among you, you do to me' Thus, Jesus insisted that we treat others with dignity, respect, and courtesy."

    c. "Nothing [B.K.] has done is aligned with your policy and he should absolutely be expelled considering he has a track record, documented, back to 6th grade that I know of related to bullying and targeting other students."

48. While Desotell did not respond to remedy the deliberate indifference of Mares, she did specifically request that Jauquet take down the Facebook post about bullying.

49. Following the meeting, Jauquet went to the Brown County Sheriff's Office to file a complaint. This necessitated a Sheriff's Deputy coming to her home to take statements and resulted in a juvenile citation being issued to B.K., the current precise status of which is not known to Plaintiff.

*GRACE Encourages I.R. to Leave the School*

50. Upon learning of GRACE's mishandling, I.R.'s grandfather sent multiple emails and letters to GRACE's president, superintendent, each board member, and the overseeing Bishop of the Diocese of Green Bay, without any prompt or substantive response from any recipient.

51. I.R. now faced the choice of having to go back to her school without any guarantee of safety or reduction of the sexual harassment and bullying. Her other option was

10

Case 1:20-cv-00647-WCG   Filed 04/23/20   Page 10 of 20   Document 1

to transfer mid-year into De Pere's public schools, where she would go from being one of about forty students to one of around 340 students.

52. As a last effort to get some effective response from GRACE to protect her daughter, Jauquet emailed both Mares and Desotell stating that if B.K. returned she had little choice but to pull both her Honor Roll students from Notre Dame.

53. The response from President Desotell was to email transfer paperwork to Jauquet with the snide message of "Merry Christmas."

54. Ultimately the Jauquet family did not decide to transfer I.R. or her sister due to the extreme impact the sudden transfer would have on their academic and emotional health and lack of another Catholic option.

*GRACE Refuses Safety Concerns*

55. On January 3, 2020, Jauquet spoke to Desotell by phone, who again stood by the decisions made. When Jauquet inquired about her safety concerns, Desotell replied that she did not feel I.R. was in any physical danger. On information and belief, no actual evidence-based safety assessment was made to support this statement.

56. Jauquet then unilaterally expressed concern about I.R.'s emotional health. Desotell's only proposed measure was to consider moving I.R.'s seat so she would not be next to B.K. in the classroom. No reassurance of safety of provided.

57. No safety plan, assessment, or other protective measures were offered by GRACE.

58. No victim services were offered by GRACE.

*B.K. Returns and Retaliation Begins*

59. The first day after Christmas Break, B.K. returned to play basketball for Notre Dame. A male friend of B.K. was suddenly suspended and multiple classmates both blamed I.R. and verbally retaliated against her.

60. Due to the retaliation, Jauquet attempted to find out if the suspension did relate to I.R. but was refused any information by Notre Dame.

61. On January 8, 2020, Desotell and one board member of GRACE met with Jauquet and admitted to her that the suspension involved a gun reference, but denied it related to I.R. while admitting that the same male student had been making sexually targeted comments about I.R.'s body.

62. Desotell then criticized Jauquet for complaining about the lack of accountability for bullying and sexual harassment at Notre Dame, calling Jauquet uncharitable and volatile.

63. Desotell further admitted that the only reason any suspension at all was imposed on B.K. was the disruption perceived to the school's routine, not because of the sexual harassment or bullying itself or its impact on the victim.

64. Asked for a communication plan to address the sexual bullying, Desotell sent an email to all 8th Grade boys stating that bullying was not allowed. GRACE did not make any communications to female students.

12

65. Desotell then falsely claimed that GRACE's written student policies do not cover social media. The policies do so explicitly and did so at the time of Desotell's statement.

66. Finally, Desotell was asked why no victim services were offered despite the GRACE written policy to do so. She responded that GRACE believed none were needed because a casual question on December 17, 2019, as to how I.R. was doing was met with a response that included "okay for now," or words to similar effect.

*"Boys will be Boys"*

67. Only after Jauquet requested that I.R. be given the right to meet with Mares and express her feelings as a victim (per policy), she was allowed to do so on January 10, 2020.

68. While the meeting was helpful to I.R. in some ways (though belatedly), it also included and led to further criticism of the Jauquet family for complaining about sexual bullying from male students.

69. This criticism included personal attacks from Desotell against Jauquet such as spurious allegations that she "coached her daughter to be more emotional" and that Jauquet's complaints were keeping the matter from being closed.

70. GRACE's criticism is entirely in line with a larger cultural tolerance of improper and in some cases illegal male sexual behavior under the traditional mantra "boys will be boys."

71. Beyond direct indifference, GRACE and Notre Dame habitually support this divergent expectation for students of different genders in ways that include, but are not necessarily limited to, the following:

    a. Female students are held to a consistently far more restrictive dress code to accommodate what is commonly referred to as "rape culture," in which male students are not expected to bear responsibility for controlling sexual arousal or keeping their sexual behaviors within accepted moral or legal boundaries.

    b. Many male students, such as B.K., maintain habitual poor or failing grades without apparent actions or repercussions from Notre Dame, while female students, on average, are expected to (and/or do) maintain strong academic performance.

    c. Male students benefit from consistent high tolerance of obscene, disrespectful, and disruptive behaviors toward teachers and students both in and outside of the classroom. The lack of response further emboldens students like B.K. to escalate harassing behaviors, including sexual ones.

72. All three of the above gender discriminatory practices have been directly observed and experienced by I.R. and create or perpetuate an environment in which I.R. and other female students are unable to benefit from an educational environment reasonably safe and free of sexual harassment and bullying.

73. At Notre Dame, B.K. and other heterosexual males conforming to traditional gender stereotypes benefit from an educational environment that is materially safer and generally free from sexual harassment against them. Conversely, female students and students not conforming to traditional gender stereotypes do not receive these same benefits.

## CAUSES OF ACTION

*Federal Title IX Claim*

74. Through the actions and omissions described above, Defendant GRACE has knowingly acquiesced and arguably encouraged severe, pervasive, and objectively offensive sexually-targeted harassment and bullying.

75. The above, coupled with GRACE's receipt of federal financial assistance, places GRACE in violation of Title IX of the Education Amendments of 1972 (*See* 20 U.S.C. §1681a).

76. GRACE's knowing indifference to sexual harassment and bullying has resulted in significant and ongoing emotional injury to both I.R. and Plaintiff Michelle Jauquet.

77. I.R. has since required—and continues to require—therapeutic treatment due to the emotional injuries caused and aggravated by GRACE's indifference.

78. I.R. has since been diagnosed with an anxiety disorder that impacts her daily life both in and out of school.

79. In contrast to her sexual bully, B.K., I.R. withdrew from extracurricular participation and has faced pervasive ongoing blame and retaliation for speaking up against sexual harassment and bullying.

80. The trauma suffered by I.R. has caused her to experience symptoms of or like Post-traumatic Stress Disorder, in which things that should be innocuous for most children trigger traumatic stress for her—for example, the mere mention of rope.

81. The above has included ongoing safety concerns, such as multiple students maintaining to I.R. that the suspension associated with a gun in January 2020 related to her, and that she was somehow to blame.

82. GRACE's indifference has also compounded the trauma by failing to validate I.R.'s pain and apprehension as a sexual harassment victim, resulting in deeper emotional challenges to come to terms with the abuse.

83. Plaintiff Jauquet has been forced to expend significant time and suffer significant distress attempting to reconcile the educational and spiritual needs of her daughter with GRACE's failure to provide a safe and non-discriminatory environment.

84. GRACE has made no good faith attempts to remedy its failure to abide by Title IX, even after additional notice of violation was provided to GRACE's leadership and its overseeing Bishop in the Diocese of Green Bay by Plaintiff's Counsel herein.

85. I.R. will be graduating from Notre Dame this Spring, but will be compelled to continue in Catholic education within the GRACE system for high school due to the absence of other local choices for Catholic education compounded by the understanding that B.K. will be attending the local public high school.

*Breach of Contract under Wisconsin State Law*

86. GRACE's actions and omissions herein not only violate its obligations under Title IX, but also constitute a breach of contract under Wisconsin state law.

87. GRACE has repeatedly made written representations that it maintains a safe and beneficial environment for its students, adhering to educational and spiritual practices beyond the minimum legal requirements found in public schools.

88. Based on these representations from GRACE, the Jauquet family has paid significant funds for the education of I.R. and her sister, at least $17,673 since starting at Notre Dame in April 2016.

89. Plaintiff Jauquet has also volunteered substantial time for Notre Dame, in everything from the role of classroom mom, to substantial fundraising.

90. For example, in November 2019 Plaintiff Jauquet co-chaired an annual fundraising event for her daughter's school known as Rise Up Raider, helping to raise over $100,000 dollars. It should be noted that only after agreeing to co-chair the event an invest significant volunteer time did GRACE inform Jauquet that the first $80,000 dollars raised would go to GRACE rather than Notre Dame of De Pere.

91. GRACE's multiple knowing failures to abide by its own policies dealing with bullying, social media, and victim protection have effectively breached the contract between GRACE and the Jauquet family and violated the implied warranty of merchantability carried by their educational services.

92. GRACE's failures to abide by the moral principles it purports to follow further adds to the breach. These failures have been accompanied by consistent attempts to conceal, or at least minimize, disclosure.

93. For example, last year GRACE knowingly hired a former pornographic bondage model to serve as a religion teacher at Notre Dame without disclosing the same to parents.

94. When some parents became aware and expressed serious concerns about the inappropriate hire, GRACE's initial response was to attempt to persuade parents to sign non-disclosure agreements. After parents refused and began pulling their children from the class, the former pornography model resigned.

*Negligence under Wisconsin State Law*

95. GRACE's indifference to safety concerns and failures to maintain adherence to policy also constitute negligence under Wisconsin state law.

96. GRACE staff have a duty to protect victims like I.R. from both physical danger and emotional abuse, at least to a reasonable extent and the extent of GRACE's own

written policies. They failed to meet that duty, resulting in significant emotional injury and distress to I.R. and her family.

**PRAYER FOR RELIEF**

97. Plaintiff therefore requests this Court grant the following relief, some of which would logically only be granted in the alternative should other relief prove impracticable:

   c. Issue a permanent injunctive order to remedy GRACE's violation of Title IX and ensure equal educational opportunities for female and male students in GRACE schools;

   d. Issue a permanent injunctive order to force specific performance of GRACE's contractual obligations and duties to protect;

   e. Grant Plaintiff a judgment for monetary damages in an amount to be determined by the Court for any monetary loss or damages found proper and compensable by the Court;

   f. Grant Plaintiff a judgment for attorney's fees and costs required for the filing and prosecution of this case; and/or

   g. Grant whatever additional relief the Court deems just and proper to bring about cessation of the violations and hold Defendant GRACE accountable for them.

98. Plaintiff reserves the right to supplement or amend this pleading as appropriate to conform to additional or subsequently discovered information or evidence.

Respectfully submitted,

\_\_s/ Brady R. Henderson\_\_\_
Brady R. Henderson, Wis. Bar #1116435, Okla. Bar #21212
Cream City Law, LLC
1123 N. Water Street, Suite 400
Milwaukee, WI 53202
(414) 563-7453
brady@creamcity.law