## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF WISCONSIN

MICHELLE JAUQUET, individually and
as legal guardian of I.R. her minor child,

   Plaintiff,

  v.           Case No. 20-C-647

GREEN BAY AREA CATHOLIC EDUCATION,

   Defendant.

## DECISION AND ORDER

On April 23, 2020, Plaintiff Michelle Jauquet, individually and as legal guardian of her minor child, who the court will refer to as "Student A," filed suit against Defendant Green Bay Area Catholic Education, Inc. (GRACE), claiming Student A was continuously bullied and harassed while she was in eighth grade at Notre Dame of De Pere Catholic Middle School. Plaintiff asserts Defendant violated Title IX of the Education Amendments of 1972 because it failed to maintain a safe and appropriate educational environment for Student A and other female students by knowingly acquiescing to sex-specific harassment so severe, pervasive, and objectively offensive that it deprives her of equal access to the educational opportunities provided by her school. She also asserts claims of breach of contract and negligence under Wisconsin law. The court has federal question subject matter jurisdiction over Plaintiff's Title IX claim. *See* 28 U.S.C. §§ 1331, 1343(a). The court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c). This matter comes before the court on Defendant's motion to dismiss. For the reasons stated below, Defendant's motion will be granted.

## LEGAL STANDARD

In considering a motion to dismiss, the court construes all allegations in the complaint in the light most favorable to the plaintiff, accepts all well-pleaded facts as true, and draws all inferences in favor of the non-moving party. *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011). To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2). It is not necessary for the plaintiff to plead specific facts and her statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). However, a complaint that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). "[T]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

## PLAINTIFF'S FACTUAL ALLEGATIONS

Defendant operates a Catholic school system consisting of nine primary and secondary schools with eleven campuses and receives federal financial assistance including funding through the National School Lunch Program. Student A has been a student in Defendant's school system

since moving to the Green Bay area in fourth grade. During the 2019–2020 academic year, Student A remained an eighth-grade student in good standing at Notre Dame of De Pere Catholic Middle School, where she has been an Honor Roll student throughout middle school. Student A regularly attended eighth grade classes at Notre Dame during the entire 2019–2020 academic year until in-person classes were cancelled due to the COVID-19 pandemic. Student A's eighth grade class consisted of 42 students.

During the fall of 2019, Student A began experiencing severe bullying from a group of male students, led by Student B, an eighth-grade male classmate at Notre Dame. In September 2019, Student A attended a two-night school-sponsored field trip to Camp U-Nah-Li-Ya, near Brussels, Wisconsin. During the field trip, Student B and other male students repeatedly called Student A "slut" and a "skinny bitch." Plaintiff did not involve the Notre Dame administration concerning the bullying because Student A feared retaliation if she came forward.

In December 2019, Student B was spreading sexually suggestive and vulgar posts on his Instagram social media page. These posts were not specifically targeted at Student A, but the graphic sexual content compelled Plaintiff to report the posts to the Principal of Notre Dame, Molly Mares. Principal Mares discussed the report with Plaintiff on December 11, 2019. Plaintiff also discovered and disclosed to Principal Mares on December 11, 2019, that, as part of a solicitation to engage in sexual acts, Student B had texted a picture of his own naked penis to a female student at a different school, which was subsequently widely shared with, and seen by, students in Student A's class. Principal Mares indicated that she was already familiar with the contents, agreed it was unacceptable, thanked Plaintiff, and promised to reach out to Student B's parents. Despite her promise to Plaintiff, Principal Mares did not immediately contact Student B's parents or take any other responsive or protective actions.

3

Three days later, on December 14, 2019, Student B initiated a Snapchat conversation under the title "squeeze my wang" in which he and other participants shared multiple sexual body-shaming statements bullying Student A, including "if you weren't 50 pounds you would be hot." The sexual harassment and body-shaming from Student B and other male classmates became deeply hurtful to Student A, prompting Plaintiff to seek a meeting with Principal Mares. On the evening of December 14, 2019, Plaintiff authored a Facebook social media post about the frustration of parenting a bullying victim, but did not mention any names in the post. During her December 15, 2019 meeting with Principal Mares, Plaintiff reported an additional inappropriate sexual and derogatory video posted by Student B the previous evening. Plaintiff requested that the school impose discipline on the male students involved by suspending them. Principal Mares responded that she would look into the matter and get back to Plaintiff shortly.

The next day, on December 16, 2020, before any response from the school was received, Student B verbally proposed to Student A's male classmates, "Let's buy [Student A] a rope and teach her to use it," referring to the use of a noose to hang oneself. Male classmates then passed on the threat or solicitation to Student A, who immediately experienced emotional distress. Student A emailed her mother to inform her about it and seek help. In response, Plaintiff immediately called Notre Dame and attempted to speak to Principal Mares. Plaintiff was told Principal Mares was unavailable. Plaintiff drove to Notre Dame and pulled Student A out of class. At this point, it was revealed that Principal Mares was at a Christmas party in the same building.

After Plaintiff arrived, Principal Mares left the Christmas party and met briefly with Plaintiff, who requested law enforcement be called. Plaintiff alleges on information and belief that Principal Mares did not make any report or request to law enforcement or other outside authority in response. Instead, Principal Mares arranged a meeting for 4:30 p.m. the same day, which

4

included Student A, Student B, and both children's parents. Upon arriving at the meeting, Plaintiff and Student A heard Principal Mares coaching Student B on how to apologize to them and what to say. At the meeting, Student B issued a rote apology, while his parents loudly and aggressively confronted Student A's parents for complaining about bullying and sexual harassment, including specifically the Facebook post made about bullying. During the meeting, Principal Mares and Student B's parents received or acknowledged actual notice of Student B's sexual bullying behaviors. The bullying was also admitted by Student B in a note sent to Student A and her family two days later. In the note, Student B acknowledged that his previous apology had been insincere. Principal Mares also had actual knowledge of the following incidents: (1) two years earlier, Student B had practiced pervasive sexual bullying against a boy using anti-LGBT slurs and a written safety plan had to be put in place to help protect the male victim from assault; (2) Student B called multiple other female students at Notre Dame "sluts"; (3) Student B's recent bullying extended to belittling an adopted classmate and shaming a student suffering from cancer by referring to her as the "Hunchback of Notre Dame"; (4) Student B continued to share social media with other Notre Dame students that included vulgar sexual material, as well as numerous racial slurs and obscenity; and (5) Student B was failing academically.

No resolution or meaningful understanding was reached at the meeting, nor were Plaintiff's requests for the school to remove Student B successful. Instead, Student B was given a three-day suspension immediately before Notre Dame's Christmas Break, allowing him an early start to his vacation and ensuring that he would be done with suspension in time to continue playing on the school's basketball team immediately following Christmas Break. No protective or restorative measures or other victim services for Student A were offered by Principal Mares or any other GRACE employee.

5

Plaintiff sought a meeting with both Kim Desotell, President of GRACE, and the school's police liaison officer, which was held on December 17, 2019. At the meeting, the school's police liaison officer was briefly present, but Desotell informed Plaintiff that the officer could not be of help because Plaintiff's family lived in nearby Ledgeview, outside her jurisdiction. Following the departure of the officer, Desotell explicitly supported and defended the decisions made by Principal Mares and indicated they would not be changed. During this discussion, Plaintiff stated that she is paying for a Catholic education and expected that values and kindness be taught. She indicated she was concerned about the impact on her daughter's mental health and long-term consequences. She stated that nothing Student B has done aligns with Defendant's policy and that he should be expelled. Desotell requested that Plaintiff take down the Facebook post about bullying. After the meeting, Plaintiff went to the Brown County Sheriff's Office to file a complaint. A deputy went to her home to take statements and ultimately issued a juvenile citation to Student B.

Student A's grandfather sent multiple emails and letters to Defendant's president, superintendent, each board member, and the overseeing Bishop of the Diocese of Green Bay, without any prompt or substantive response from any recipient. Plaintiff emailed both Principal Mares and Desotell stating that if Student B returned, she had little choice but to pull both of her Honor Roll students from Notre Dame. Desotell emailed transfer paperwork to Plaintiff. Plaintiff did not decide to transfer Student A or her sister due to the impact the sudden transfer would have on their academic and emotional health and the lack of another Catholic option.

On January 3, 2020, Plaintiff spoke to Desotell by phone, who again stood by the decision made. When Plaintiff inquired about her safety concerns, Desotell replied that she did not feel Student A was in any physical danger. Plaintiff then expressed concern about Student A's

6

emotional health. Desotell's only proposed measure was to consider moving Student A's seat so she would not be next to Student B in the classroom. Defendant did not offer a safety plan, assessment, or other protective measure or victims services.

The first day after Christmas Break, Student B returned to play basketball for Notre Dame. A male friend of Student B was suddenly suspended, and multiple classmates blamed Student A and verbally retaliated against her. Plaintiff attempted to find out if the suspension did relate to Student A but was refused information by Notre Dame. On January 8, 2020, Desotell and one board member met with Plaintiff and admitted to her that the suspension involved a gun reference. They denied the suspension related to Student A but admitted that the same male student had been making sexually targeted comments about Student A's body. Desotell then criticized Plaintiff for complaining about the lack of accountability for bullying and sexual harassment at Notre Dame, calling Plaintiff uncharitable and volatile. Desotell further admitted that the only reason any suspension was imposed on Student B was the disruption perceived to the school's routine, not because of the sexual harassment or bullying itself or its impact on the victim. Desotell sent an email to all eighth-grade boys stating that bullying was not allowed. Defendant did not make any communications to female students. Desotell then claimed that Defendant's written policies do not cover social media, even though Plaintiff contends the policies do so explicitly. Desotell was asked why no victim services were offered despite Defendant's written policy to do so. She responded that Defendant believed none were needed because a casual question on December 17, 2019, as to how Student A was doing was met with a response that included "okay for now."

Only after Plaintiff requested that Student A be given the right to meet with Principal Mares and express her feelings as a victim was Student A allowed to do so on January 10, 2020. While the meeting was helpful to Student A in some ways, it also included and led to further criticism of

Plaintiff's family for complaining about sexual bullying from male students. This criticism included personal attacks from Desotell against Plaintiff such as spurious allegations that she "coached her daughter to be more emotional" and that Plaintiff's complaints were keeping the matter from being closed. Plaintiff alleges Defendant and Notre Dame habitually support a divergent expectation for students of different genders.

## ANALYSIS

### A. Title IX

Plaintiff alleges Defendant violated Title IX. Title IX provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To sufficiently plead Title IX sex discrimination, a plaintiff must allege "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (citation omitted). To survive a motion to dismiss, the plaintiff "must provide some allegations to allow the Court to infer a causal connection between [her] treatment and gender bias and raise the possibility of relief under Title IX above the speculative level." *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 792 (N.D. Ill. 2015).

Plaintiff asserts she has pled a plausible prima facie case of discrimination based on "affirmative gender discriminatory policies and practices that, in addition to their direct impacts on Plaintiff's daughter, also support sexual bullying and allow it to flourish." Pl.'s Resp. Br. at 3, Dkt. No. 9. More specifically, Plaintiff alleges "female students are held to a consistently far more restrictive dress code to accommodate what is commonly referred to as 'rape culture;'" many male

8

students maintain "habitual poor or failing grades without apparent actions or repercussions from Notre Dame, while female students, on average, are expected to (and/or do) maintain strong academic performance;" and male students "benefit from consistent high tolerance of obscene, disrespectful, and disruptive behaviors toward teachers and students." Compl. ¶ 71. She asserts that Defendant and Notre Dame created or perpetuated "an environment in which [Student A] and other female students are unable to benefit from an educational environment reasonably safe and free of sexual harassment and bullying." *Id.* ¶ 72.

These allegations are too vague and indefinite to state a claim for sexual discrimination or harassment on the part of the school. The allegation that "female students are held to a consistently far more restrictive dress code to accommodate what is commonly referred to as a 'rape culture'" suggests at most that the school requires a certain degree of modesty in the clothing worn by female students. It is unclear what the phrase "far more restrictive" means as applied to the dress code for female students. The mere fact that a school has a dress code is not discriminatory as to either biological gender. Adding the phrase "rape culture" offers nothing but shock value to the allegation. The allegation that male students maintain "habitual poor or failing grades without apparent actions or repercussions from Notre Dame, while female students, on average, are expected to (and/or do) maintain strong academic performance" also falls short. The fact that male students receive "poor or failing grades" would itself seem the proper response or "repercussion" for poor academic performance, just as higher grades would seem appropriate for the strong academic performance of female students. And the allegation that male students "benefit from consistent high tolerance of obscene, disrespectful, and disruptive behaviors toward teachers and students," absent more, is too vague and conclusory to state a claim. In short, Plaintiff has failed to state a claim for direct sexual discrimination by the school.

9

Plaintiff primarily seeks to assert a Title IX claim based on student-on-student harassment. Under Title IX, a recipient of federal funds may be liable only for damages suffered as a result of its own misconduct. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). "The Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014). The Supreme Court has held that a school may be liable if the school is "deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Stated differently, a plaintiff complaining of peer harassment must allege "(1) the harassment was based on sex, (2) it was at an educational institution that was receiving federal funds, (3) the harassment was so severe, pervasive, and objectively offensive that it deprived the victim of access to educational opportunities, and (4) the school officials had actual knowledge of the harassment and were deliberately indifferent to it." *Columbia Coll.*, 933 F.3d at 856. Defendant argues that the court should dismiss Plaintiff's Title IX claim because the instances of harassment alleged are not actionable under Title IX; the harassment alleged was not so severe, pervasive, and objectively offensive such that it deprived Student A of access to educational opportunities; and Defendant was not deliberately indifferent to the alleged harassment.

The court need not address each of the elements of such a claim since it is clear Plaintiff's complaint fails to allege the school was deliberately indifferent to the alleged harassment. The Supreme Court has held that a school is "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 633. The Seventh Circuit

Case 1:20-cv-00647-WCG   Filed 08/25/20   Page 10 of 13   Document 13

has referred to Title IX's deliberate indifference standard as a "high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Galster*, 768 F.3d at 617. Concerned over the potential for increased litigation, *Davis* explained that there is "no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." 526 U.S. at 649. This is such a case.

Between December 11, 2019 and January 8, 2020, school officials and Defendant's officials met or communicated with Plaintiff after each report of bullying or inappropriate behavior. After Student B proposed to Student A's classmates to "buy [Student A] a rope and teach her how to use it" and Plaintiff drove to Notre Dame to discuss the incident with Principal Mares, Mares met with Plaintiff and then arranged a meeting later that day with Student A, Student B, and both of their parents. At the meeting, Student B issued Student A an apology. Though the apology was insincere, he later acknowledged that fact and his behavior in a note to Student A and her family. Student B was given a three-day suspension. There is no allegation of any harassment of Student A by Student B after that day, which was only four days after Plaintiff first brought the matter to the school's attention.

Plaintiff met with Defendant's president and the school's liaison officer the following day to discuss her concerns. Plaintiff expressed belief that Student B should be expelled, but Desotell supported Principal Mares' disciplinary decisions. In January, Plaintiff spoke to Desotell by phone, and Desotell suggested to separate Student A and Student B by offering to move Student A's seat in class. When the students returned after Christmas Break and multiple classmates verbally retaliated against Student A after a male friend of Student B was suspended, Desotell emailed all the eighth-grade boys stating that bullying was not allowed. Student A met with

Principal Mares on January 10, 2020, to express her feelings as a victim, and Student A found the meeting to be helpful in some ways.

Plaintiff asserts that Defendant failed to use many tools at its disposal to mitigate the effects of the sexual harassment. *Davis* does not entitle plaintiffs to any specific remedial measure or require that a school remedy all peer harassment, and a school's actions do not become clearly unreasonable simply because a student's parents advocated for stronger remedial measures. 526 U.S. at 648; *Galster*, 768 F.3d at 621. The question is not whether the school could have handled the matter better or differently but instead is whether the school's decisions were clearly unreasonable. The Seventh Circuit has recognized that courts regard "the involvement of parents as evidence that a school district is responding to harassment in a reasonable manner." *Galster*, 768 F.3d at 620. To repeat, Defendant and school officials met with Plaintiff numerous times to address her reports of bullying, suspended Student B for three days, emailed the eighth-grade boys stating that bullying was not allowed, offered to move Student A's seat in class, and met with Student A to allow her to express her feelings. Plaintiff does not explain why the actions taken by Defendant and school officials were "clearly unreasonable" under the circumstances presented.

To be sure, assuming Plaintiff's allegations are true, the conduct of Student B was deplorable and deserving of condemnation. The court is sympathetic to students and parents who face bullying issues. But a federal court is rarely the proper forum for addressing and resolving disputes over the proper level of school discipline. The Supreme Court has made clear that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648; *see also Estate of Lance v. Lewisville Indep. School Dist.*, 743 F.3d 982, 996 (5th Cir. 2014) ("Judges make poor vice principals . . . ."). "Federal law gives school officials wide discretion in making disciplinary decisions, especially as they have to balance the interests

12

of all concerned." *Galster*, 768 F.3d at 621. Defendant took timely corrective action which appears to have succeeded in stopping Student B's bullying. The court concludes as a matter of law that Defendant was not clearly unreasonable and thus deliberately indifferent to the alleged harassment. Therefore, Plaintiff has failed to state a claim under Title IX.

**B. State Law Claims**

Plaintiff has also asserted state law claims against Defendant. Having determined that the Title IX claim is subject to dismissal, the court must determine whether to exercise supplemental jurisdiction over the state law claims. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 749 F.3d 904, 907 (7th Cir. 2007). The court will follow this presumption and decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## CONCLUSION

For these reasons, Defendant's motion to dismiss (Dkt. No. 5) is **GRANTED**. Plaintiff's Title IX claim is dismissed with prejudice, and Plaintiff's state law claims are dismissed without prejudice. The Clerk is directed to enter judgment of dismissal forthwith.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of August, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

13